**LAND O' LAKES CREAMERIES, INC.,**
Appellant,

v.

**COMMODITY CREDIT CORPORATION,**
Appellee.

No. 16855.

United States Court of Appeals
Eighth Circuit.

May 31, 1962.

Rehearing Denied June 20, 1962.

Harold Jordan, of Doherty, Rumble & Butler, St. Paul, Minn., made argument for appellant and was on brief.

John J. Connelly, Asst. U. S. Atty., Minneapolis, Minn., made argument for appellee, and Miles W. Lord, U. S. Atty., Minneapolis, Minn., Howard B. Pickard and John H. Shouse, Attys., U. S. Dept. of Agriculture, Washington, D. C., were on the brief.

Before VOGEL, BLACKMUN and RIDGE, Circuit Judges.

RIDGE, Circuit Judge.

This appeal is from a judgment in favor of Commodity Credit Corporation (CCC) on a counterclaim asserted by way of set-off, to a claim by Land O' Lakes Creameries, Inc. (L.O.L.). The liability of CCC to L.O.L. is not in dispute. The complex facts giving rise to CCC's counterclaim are meticulously and fairly set forth in the opinion of District Judge Devitt, reported at D.C., 185 F.Supp. 412. Since appellant's assignments of error on appeal are tantamount to legal issues considered and ruled by Judge Devitt and ready reference may be had to his opinion, it would serve no useful purpose for us to repeat or paraphrase his statement of the facts. Hence we shall only advert to those facts which will give some conception of the premise of appellant's assignments of error.

In the years 1953 and 1955, L.O.L. sold to CCC, under formal written requirement contracts numerous carlots of dried milk for human consumption. We are concerned only with those carlots delivered to CCC at appellant's Dresser, Wisconsin and Lake Crystal, Minnesota plants. Each contract entered into by the parties concerning those shipments contained a standard disputes clause reading as follows:

"Any dispute concerning questions of fact which may arise under the Contract and which is not disposed of by mutual agreement, shall be decided by the officer executing the Contract in behalf of the Agency or by a designee of the Agency who shall reduce his decision to writing and mail a copy to Contractor. Within 30 days from said writing Contractor may appeal to the head of Agency, whose decision or that of his designated representative shall be final and conclusive upon the parties. Pending decision of such dispute the Contractor shall diligently proceed with the performance of the Contract."

A dispute arose between CCC and L.O.L. as to insect infestation at time of delivery of some of the involved carlots. The dispute was ultimately determined by the Contract Disputes Board of CCC whose function and jurisdiction are set forth in Section 400.1 to 400.5, Title 6, C.F.R. (1956).

Initially, CCC through its Contracting Officer claimed thirteen (13) carlots of dried milk delivered from appellant's Lake Crystal plant and seven (7) carlots delivered from its Dresser plant were insect-infested. On appeal the Contract Disputes Board only sustained CCC's claim of insect infestation and rescission of contract for breach of warranty as to eleven (11) of the Lake Crystal and three (3) of the Dresser plant carlots. As to the remaining carlots, the Board found that as to some such, "notice of rescission was not timely given" and as to others, that insect infestation was not established at time of delivery. As to the fourteen (14) carlots found to be insect-infested, the Contract Disputes Board made the following findings:

"a. There was an implied warranty that the milk powder (including the liners and containers in which packaged) was reasonably fit for the purpose for which intended, namely, human food.

"b. The same insect was found in the carlots of milk powder and at the manufacturing plant at Lake Crystal, Minnesota. The same insect was found in numerous cars of milk powder originating from the manufacturing plant at Dresser, Wisconsin, and stored in several different warehouses at different locations.

"c. The petitioner delivered to CCC milk powder which, at the time of such delivery, was insect infested or which was contained in liners or containers which were insect infested. Such delivery constituted a breach of warranty on the part of petitioner.

"d. CCC notified the petitioner within a reasonable time of its election to rescind the sale because of the breach of warranty on the part of the petitioners."

Subsequent to the above events and during the month of September, 1958, L.O.L. sold CCC other carlots of nonfat dry milk for a total price of $31,629.-30. When time of payment for that milk accrued, CCC only paid L.O.L. $1,057.43, and offset as a payment of the balance the sum of $30,843.57.[1] As a consequence of that set-off L.O.L. instituted the instant action against CCC to recover the amount so withheld.

In its statement of claim filed in the District Court L.O.L. alleged, among other things, that the basis of CCC's claimed offset was the decision rendered by the Contract Disputes Board of August 29, 1958. In respect to that matter, L.O.L. alleged, "(t)he decision of said Contract Disputes Board * * * was not supported by substantial evidence"; that the facts considered by the Contract Disputes Board did not legally establish an "implied warranty arose from (the) sales as regards insect infestation because the product was sold on CCC's own grading certificates"; that the notice of rescission sent by CCC regarding the Dresser plant transaction "failed to include an offer to return the goods to the place of delivery and, therefore, such notice did not constitute a rescission of those contracts of sale as a matter of law." As to the Lake Crystal transaction, L.O.L. alleged that CCC sold the product before it had decided that there was a breach of warranty and claimed that as a matter of law there could not be any valid rescission as to those contracts of sale. As to both transactions L.O.L. asserted that CCC's "only remedy (was) to recover damages measured by its loss directly resulting from breach of alleged implied warranty," and not for rescission; that because the Contract Disputes Board's decision was premised in a finding of "rescission" the District Court was limited in its consideration of the Agency's action in this case to the decision as it was made and since the decision of the Board could not be sustained on that theory CCC's offset claim could not be sustained.

By its answer and counterclaim CCC joined issue as to each allegation so made by L.O.L. and premised its offset claim on the decision of the Contract Disputes Board. Hence it appears that both parties here proffered and used the record and decision of the Contract Disputes Board as the premise of their respective claims. As Judge Devitt said: "The issue (as joined by the parties, was) whether to uphold the decision of the Board and thus to allow the defendant's (appellee's) setoff." In respect to that issue he determined "there is substantial evidence (in the record) to support the Board's findings"; that the decision of the Board was "final and conclusive"; that it was not "fraudulent or capricious or arbitrary or so grossly erroneous as necessarily to imply bad faith" within the ambit of Section 321, Title 41 U.S.C.A.

██ In addition to his published opinion, Judge Devitt also filed formal findings of fact and conclusions of law. Ap-

---

1. This sum is the amount the Contract Disputes Board found CCC was entitled to recover from L.O.L. under its findings of fact and conclusions as to the Dresser and Lake Crystal transactions.

pellant's assignments of error in this Court are solely directed to three of the conclusions of law so entered. We shall first consider appellant's assignment that the District Court erred in its Conclusion of Law No. 1, whereby it ruled that there was an implied warranty with regard to the sale of the Dresser carlots. The gist of appellant's contention is that the Dresser carlot sales were not made because of any reliance by CCC on L.O.L.'s skill and judgment as to the fitness of such milk for human consumption within Section 15(1) of the Uniform Sales Act, nor was it one made by way of "description" within Section 15(2) of that Act. The premise therefor as laid by L.O.L. is that the milk in those carlots was inspected by the Department of Agriculture and no insect infestation was found; that both CCC and L.O.L. were aware of the problem of insect infestation at that time; that after such inspection that quantity of milk was set aside and identified for sale to CCC before any contract of sale was ever made. Consequently, L.O.L. says that such "was not a sale by description but a sale of specific goods" as to which no implied warranty existed under Section 15(1) of the Uniform Sales Act, and the District Court erred in ruling otherwise. This contention is premised on an inference made by appellant that evidence adduced before the Contract Disputes Board revealed that there was no practical means of detecting insect infestation at a larvae state in the dried milk in question at time of sale and delivery and as a consequence there could be no reliance by CCC as to the "fitness" of the Dresser milk for human consumption. In support thereof appellant mainly relies on our opinion in Maryland Casualty Company v. Independent Metal Products Company, 203 F.2d 838 (8 Cir. 1953). We summarily reject this contention for it grows out of a misconception of the ruling made in that case. There, the buyer "designated, directed, supervised and inspected" the manufacture of the goods sold and there was specific evidence adduced that the purchaser did not rely upon the skill or

judgment of the manufacturer. Here, the Contract Disputes Board found that the initial inspection made by the Department of Agriculture before delivery of the milk "was not made for the purpose of detecting the presence of insect infestation—and the method employed" in that inspection was incapable of detecting the presence of insect infestation. Appellant's argument presupposes that the only method of producing dried milk, insect-free, is by inspection of the product after manufacture. There was no evidence in this case that "no one knew how to achieve" the manufacture of dried milk, insect-free. Such is the *sine qua non* of appellant's argument. (Cf. Stiefel Feed Co. v. Aerovent Fan Co., 238 F.2d 859 (6 Cir. 1956)). Furthermore, the standard form contract between the parties ("Specification", "Inspection", and "Delivery") expressly provided that the "commodity shall meet the specifications prescribed" and that the "issuance of inspection certificates, notice to deliver, or bills of lading, or the making of payment by the Agency shall not constitute waiver of requirements for * * * meeting specifications." In light of the foregoing, there is no evidence in the record of this case to sustain appellant's contention that the Dresser sale was not one by "description" and that no implied warranty of fitness existed in respect to that milk. There was, however, sufficient evidence before the Contract Disputes Board to reasonably sustain a finding of implied warranty as to all such carlots of milk. United States v. Hamden Creamery Co., Inc., 297 F.2d 130, (2 Cir. 1961); Smith v. Great Atlantic & Pacific Tea Co., 170 F.2d 474 (8 Cir. 1948); Giant Manufacturing Co. v. Yates-American Machinery Co., 111 F.2d 360 (8 Cir. 1940).

Appellant claims the District Court erred by its Conclusion of Law No. III, whereby it ruled that there was an effective rescission of the Dresser and Lake Crystal contracts of sale. The basis therefor as to the Lake Crystal carlots is that the milk was sold by CCC for animal feed before any notice of intention to rescind was declared, and no offer to re-

turn that product having been made, rescission was not a right open to CCC as a matter of law. Conclusion of Law No. III as stated by the District Court is as follows:

> "The sale of insect infested powder by CCC for which payment had been made without perfecting its offer or tender of return of the milk to the seller was not inconsistent with rescission when such offer or tender of return would obviously have been futile. There was no error of law in the determination of the Contract Disputes Board that the 12 contracts were effectively rescinded."

Manifestly, the factual premise for that Conclusion as to the Lake Crystal carlots was that as soon as L.O.L. was notified of possible infestation of some of those carlots, and without waiting for completion of CCC's inspection of all carlots, L.O.L. "moved quickly in arranging with CCC for having all the Lake Crystal cars put up for sale as animal feed at CCC's published price," and that L.O.L. "was the purchaser" of all such milk at that arranged sale.

■ By its Finding of Fact No. 18 the District Court found:

> "Land O' Lakes purchased" the Lake Crystal milk "at CCC's announced price for dry milk sold for animal feed in order to mitigate damages in the event it should be later determined that it was liable for infestation."

The evidence before the Contract Disputes Board established that the Lake Crystal milk was resold to L.O.L. two days after insect infestation was found in only a part thereof; that CCC had not completed its inspection of all such milk; and that it was by arrangement between the parties that such milk was sold for "animal feed." It was further revealed to the Board that shortly before that arranged resale appellant's Lake Crystal plant had been inspected and found to be insect infested. It was not until after the resale that CCC determined that insect infestation of the same type was found in the Lake Crystal milk as was found in the plant, and it was because of that fact that CCC notified L.O.L. of its rescission as to all the Lake Crystal carlots. Prior to that determination, L.O.L. had informed CCC: "This is to advise you that we disclaim any liability relative to insect infestation on the (Lake Crystal) lots as set forth in your letter." We believe that CCC's action in promptly notifying L.O.L. that such milk was insect-infested and that L.O.L., without waiting for CCC to inspect all the Lake Crystal carlots, arranged for the sale thereof as "animal feed", and its disclaimer of any liability relative to insect infestation of the Lake Crystal milk, was sufficient showing to relieve CCC of the necessity for making any tender of return of that milk. The District Court properly declared as a matter of law that "tender of return would obviously have been futile" under such circumstances and "there was no error" in the determination of the Contract Dispute Board's decision that such "contracts were effectively rescinded." In other words, L.O.L.'s conduct as to the arranged sale and its denial of liability before CCC could reasonably make a final determination that there was a breach justifying rescission, was a waiver of tender as a condition to a legal rescission. Cf. Pfeiffer v. Independent Plumbing & Heating Co., (Mo.App.) 72 S.W.2d 138; Kuhlman v. Weiben, 129 Iowa 188, 105 N.W. 445, 2 L.R.A.,N.S., 666.

■ In 52 Am.Jur., Tender, Sec. 4, p. 216, it is said:

> "(I)f the tender is prevented through a contrivance of the person to whom it should be made, it will be excused or be considered as if made.
> \* \* \*

> "The familiar rule that the law does not require one to do a vain or useless thing excuses the making of formal tender which would otherwise be required, where it is reasonably plain and clear that, if made, such a tender would be an idle ceremony and of no avail \* \* \*."

Strict tender is not always required to protect the rights of a buyer of goods where "a return is prevented by some act or conduct of the seller." 77 C.J.S. Sales § 107, p. 813. Furthermore, an "offer to return" as a condition precedent to rescission is a rule of law for the protection of the party to whom the offer should first be made. Where, as here, it is established that the seller repurchases the identical goods sold, with knowledge of a possible claim of infestation which would make the goods unfit to the implied warranty accompanying the sale, we do not believe that the seller is in any position to assert as a defense to a claim for the purchase price paid, failure to return when it is admitted that the seller arranged for the resale.

▮▮▮ L.O.L.'s contention that the March 8, 1954 letter of CCC as to the Dresser carlots was ineffective as a notice of rescission because the intention and election to rescind were equivocally and conditionally stated, is without merit. A simple answer to that contention is that on March 12, 1954, L.O.L. by letter denied responsibility for insect infestation of the carlots in question and made no contention as to the form of the letter first claiming rescission. Thereafter, on March 22, 1954, CCC unequivocally and unconditionally made manifest its intention to rescind and stated in view of L.O.L's denial of responsibility for infestation, the Dresser carlots were being sold as animal feed for the account of L.O.L. Whether rescission of a contract is timely is a question of fact. 77 C.J.S. Sales § 110d, p. 820. A party might "waive his right to rescind" a contract of sale "on the condition that" the goods be made fit to their warranty, and when the warranty is not met "he still (has) the right to rescind, provided he exercised it seasonably." Bratberg v. Advance-Rumely Thresher Co., 61 N.D. 452, 238 N.W. 552, 567, 78 A.L.R. 1338. So, notwithstanding the conditions stated in the letter of March 8, 1954, as to rescis-

sion of the Dresser carlots, when L.O.L. denied liability for infestation of the Dresser milk and CCC subsequently gave unconditional notice of rescission of the contracts in question, the Contract Disputes Board could reasonably have found legal notice of rescission was given as to those carlots.

By its Declaration of Law No. VI, the District Court ruled:

"As a matter of law the award of damages by the Contract Disputes Board is supported as a recovery of minimum damages for breach of warranty without regard to the legal doctrine of rescission."

It is appellant's contention that in its concoction of that Conclusion of Law the District Court "intruded upon the domain of the" Contract Disputes Board and entered its judgment herein on a ground not considered by the Board or disclosed by the record made before the Board, because CCC made no effort to enforce any claims of damages against it for breach of warranty. In support of that contention appellant relies upon Securities and Exchange Commission v. Chenery Corporation, 318 U.S. 80, 63 S.Ct. 454, 87 L.Ed. 626, and 332 U.S. 194, 67 S.Ct. 1575, 1760, 91 L.Ed. 1995. When the record made before the District Court in this case is examined and fairly comprehended, we do not believe that the ruling in the Chenery case is applicable here. In any consideration of the content of Conclusion of Law No. VI, it should be noted that in its Conclusion of Law No. III, supra, the District Court specifically declared: "There was no error of law on the part of the Contract Disputes Board (in holding) that the 12 (sic) contracts were effectively rescinded." [2]

From a most cursory reading of the "Findings of Fact and Conclusions of Law" as made by the District Court, considered in the light of its opinion supra, it is apparent that the decision of the Contract Disputes Board was af-

2. The contracts covering 14 cars were found to have been timely rescinded by the Contract Disputes Board.

firmed by that Court on the basis of legal "rescission" and not singularly on the ground of breach of warranty as appellant contends.

■ Seemingly at the trial before the District Court appellant urged that legal "rescission" of the contracts in question could not be sustained by the record made before the Contract Disputes Board. We have hereinabove demonstrated the fallacy of appellant's contention in that regard. We believe the District Court did likewise by its Findings of Fact and Conclusions of Law and in its opinion supra. But it was because that issue was injected into this case by appellant, along with its contentions that CCC's only remedy for claim of damages against it was for breach of warranty; that no remand to the Board could be made for consideration of that issue because this was a "direct" and not a "review" action; and that if the Board would have attempted to premise its decision on breach of warranty, proof of damages for such breach could not be sustained because under its price support program CCC gave away two-thirds of its dried milk and thus it could not have lost any money on the sale in question, even if the milk had been perfect and free from insect infestation at time of delivery, that Judge Devitt very apparently entered Declaration of Law No. VI, supra. (See D.C. 185 F.Supp. l. c. 422.) Regardless, it is apparent from the record before us that upon seasonable rescission of the contracts here in question CCC was only entitled to recover as damages from L.O. L. the difference between the price it paid for the milk and the amount received by it upon resale thereof as above noted. Whether such amount of recovery was tantamount to or would "support a recovery of minimum damages for breach of warranty without regard to the legal doctrine of rescission" is immaterial. "So long as there is warrant in the record for the judgment of the (fact finding) body it must stand. * * * The judicial function is exhausted when there is found to be a rational basis for the conclusions approved by the administrative body."

Rochester Telephone Corp. v. United States, 307 U.S. 125, 146, 59 S.Ct. 754, 83 L.Ed. 1147 (1939).

■■ By its Conclusion of Law No. VI the District Court did not change, modify or vary the amount of CCC's damages as found and determined by the Contract Disputes Board. In the statement of that conclusion it is clear that the District Court did not sustain the decision of the Contract Disputes Board "on a different legal doctrine" than that used by the Agency in ascertainment of the correct amount of damages allowed to CCC. Hence the doctrine of the Chenery case supra is inapplicable here. But if there was any error committed by the District Court in its statement of Conclusion of Law No. VI supra it could be no more than harmless error and such error would not warrant any reversal of the judgment in this case. Rule 61, F.R.Civ.P., Title 28 U.S.C.A.

The judgment appealed from is affirmed.